IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LENADO S. SUMMAGE,

               Petitioner,

    vs.

DIANE SABATKA-RINE, Interim
Director of the Nebraska Department of
Correctional Services;

             Respondent.

**8:21CV66**

**MEMORANDUM AND ORDER**

Petitioner Lenado S. Summage ("Summage" or "Petitioner") has filed a petition for a writ of habeas corpus under the provisions of 28 U.S.C. § 2254. (Filing 1.) Respondent has answered and filed the relevant state court records. (Filing 10.) Petitioner retained counsel, and the parties have fully briefed the case. On March 8, 2022, I heard oral argument on Petitioner's habeas petition (filing 1), Respondent's Answer (filing 11), and the parties' respective briefs (filings 12, 16, & 17). I took judicial notice of the entire court file. For the reasons that follow, I will deny and dismiss the habeas petition with prejudice.

## I. CLAIMS

Summarized and condensed, and as set forth in the court's initial review order (filing 6), Petitioner asserts the following claims that are potentially cognizable in this court:

CLAIM ONE: Petitioner was denied due process of law since the evidence was insufficient to prove that Petitioner was guilty of sexual assault in the first degree.

CLAIM TWO: The District Court denied Petitioner his right of confrontation when the District Court allowed the sexual assault nurse to testify as to out-of-court statements made by the alleged victim.

CLAIM THREE: Petitioner was denied effective assistance of trial counsel for one or more of the reasons set forth in Ground Three of the Petition.

CLAIM FOUR: Petitioner was denied effective assistance of appellate counsel for one or more of the reasons set forth in Ground Four of the Petition.

## II. BACKGROUND

### A. Convictions and Sentences

A jury convicted Summage of first degree sexual assault in the District Court of Douglas County, Nebraska, on September 26, 2014. (Filing 10-11 at CM/ECF p. 8.) The state district court sentenced Summage to 25 to 30 years in prison. (*Id*. at CM/ECF p. 11.)

I state the facts surrounding Summage's conviction as they were recited by the Nebraska Court of Appeals on direct appeal in *State v. Summage*, No. A-15-005, 2015 WL 7261674 (Neb. Ct. App. Nov. 17, 2015) (filing 10-3). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

> The evidence at trial showed that on April 6, 2013, F.G. had an argument with her stepmother at their home and decided to run away. She took several items with her including $12 cash, razorblades, and her antidepressant medication. F.G. testified that she packed razorblades because she had been "self-harming" for a while, i.e. cutting herself with razorblades. She also testified that she had been taking her antidepressant medication as prescribed and that it did not affect her ability to remember things.

2

F.G. left her house around 11:30 p.m. and walked to a Kwik Shop gas station located at 72nd Street and Crown Point Avenue, Omaha, Nebraska. She entered the Kwik Shop, bought two energy drinks, and used the restroom.

Around the same time that F.G. was at the Kwik Shop, Summage entered the Kwik Shop. Summage briefly spoke with one of the cashiers, Amanda Jimerson, and then exited the store. Jimerson knew Summage because he was a frequent customer at the Kwik Shop and she often spoke to him when he came into the store. Jimerson testified that she did not know Summage's full name but knew him as "Leo." She testified that on the evening of April 6, 2013, Summage was wearing eye glasses and a distinctive "Jordan" hat. Jimerson also testified that she knew Summage had tattoos "all up his arm" and possibly on his neck. However, Summage was wearing a long-sleeved shirt on April 6.

Jimerson walked outside with Summage to see his new car, which was parked in front of the entrance. Jimerson testified the car was a gold two-door model with in-transit signs in the front and back windows. While outside, Summage and Jimerson talked about the car and the upcoming birth of Summage's daughter.

While Jimerson and Summage were standing by Summage's car, F.G. exited the Kwik Shop and began walking south. F.G. testified that she heard a man ask her how she was doing. When she looked back to say "fine," she noticed an African-American male standing next to a car talking to a woman, but did not recognize either of them. At that point, Summage told Jimerson that he should give "that girl" a ride because she should not be walking by herself that late at night. Jimerson responded by calling Summage a "weirdo." Although F.G. did not hear what Summage and Jimerson were talking about, she heard Jimerson say "what a weirdo" and assumed the comment was directed at her. F.G. walked south through the parking lot and past nearby apartment garages before eventually heading south on 72nd Street. Jimerson testified that at that point, she lost sight of F.G. and she re-entered the Kwik Shop and returned to her cash register.

3

A few minutes later, Summage got in his car and left the Kwik Shop parking lot, turning left onto Crown Point Avenue and then turning left onto 72nd Street and heading south.

Shortly after F.G. left the Kwik Shop, a car pulled up next to her while she was walking south on 72nd Street. The car initially had been traveling south on 72nd Street the same direction F.G. was walking, but made a U-turn and pulled up next to her. F.G. noted the car had two doors and appeared to be dark in color; however it was close to midnight and the lighting was not very good.

F.G. testified that the driver and sole occupant of the car was an African- American male who was wearing glasses. The man, who was later identified as Summage, asked F.G. where she was going, and F.G. told him that she wanted to go to Wal-Mart. Summage offered to give F.G. a ride and she accepted.

After F.G. got in the car, Summage drove to a neighborhood near 78th Street to meet a friend. During the drive, F.G. and Summage engaged in conversation. F.G. disclosed that she had run away from home. Summage asked her how old she was, if she drank or used drugs, and why she ran away. F.G. told Summage that she was 16 years old, did not drink or use drugs, and had runaway because she was looking for an adventure. At some point during the drive, Summage told F.G. that his name was "Leo." He further told her that Leo was short for his actual name and told her what it was. He also offered to let F.G. look at his driver's license, but she did not look at it because "it seemed weird." F.G. testified that she could not remember what the name Leo was short for, but knew that it was something unusual.

When F.G. and Summage arrived in Summage's friend's neighborhood, he tried calling the friend, but the friend did not answer. They remained in the neighborhood for approximately five minutes and then left. When F.G. again told Summage that she wanted to go to Wal-Mart, Summage said Wal-Mart was far from where they were and that he wanted money for gas. F.G. gave him $4 and some change and he drove to a gas station. Summage did not put gas in his car, but instead went inside the gas station and bought something. F.G. did not know what he bought. When he returned, F.G. again told Summage that she wanted to go to Wal-Mart, at which time Summage asked F.G. if she

4

knew how to make money. F.G. construed the question as a request for sex and said "no." Summage then told F.G. that because Wal-Mart was far away, she would have to give him something to get there. F.G. again construed Summage's statement as a request for sex and she said "no." Summage next asked F.G. if she knew where they were. She said that she did not know and she attempted to get out of the car. When F.G. opened the passenger door and started to get out, Summage grabbed her and pulled her into the car. Summage told F.G. that she could "either give it to [him] or [he] can take it." Summage then drove to a nearby parking lot. While Summage drove, he held onto F.G. as she tried to get away. After pulling into the parking lot, which was dark and had little lighting, Summage threw F.G. into the backseat. She landed on her back with her head on the driver's side of the car. Summage then climbed into the backseat and was in a kneeling position over F.G. F.G. attempted to push Summage away and get out of the car, but he told her that if she fought him he would "fuck [her] up." Summage removed his long-sleeved shirt and then pulled down F.G.'s pants and underwear far enough to remove one pant leg and one side of her underwear. Summage then pulled his pants and underwear down and told F.G. "[she] was lucky . . . that [he] was doing it and not someone else because he was going to use a condom." Summage then tore open a condom and threw the wrapper on the back dash of the car. Summage attempted to penetrate F.G.'s vagina with his penis but was unsuccessful at first, which F.G. testified was painful. F.G. told Summage to stop, but he did not. F.G. testified that Summage repositioned her on the backseat and successfully penetrated her vagina with his penis. She also testified that Summage may have used saliva to lubricate her, but she was not sure. F.G. testified that as this was happening, Summage reminded her that she told him she was looking for an adventure. After Summage was done, he put his clothes on, exited the car through the passenger-side back door, and walked around to the driver's side of the car and got in. F.G. put on her pants and climbed back into the front passenger's seat. She testified that she did not try to run away from Summage because she was scared and did not know where she was.

After F.G. and Summage were both back in the front seat of the car, Summage told F.G. that men would pay $300 to have sex with her. Summage also told F.G. he would take her to the bus station and buy her a ticket to Chicago. She had told Summage prior to the assault that she liked Chicago.

Around 1 or 2 a.m. on April 7, 2013, Summage dropped F.G. off at the bus station. He gave her a phone number and told her to call that number to get the confirmation number for the bus ticket. After F.G. was at the bus station for an hour she called the phone number Summage gave her. She testified that someone answered, but told her she had the wrong number. F.G. testified that she felt hopeless and decided to try to kill herself by swallowing about 15 of her antidepressant medication pills. Shortly after taking the pills, F.G. became ill and vomited. She later purchased food from the vending machines with the $3 she had left, and called her ex-boyfriend from a pay phone, but he did not answer.

F.G. did not tell anyone in the bus terminal that she had been sexually assaulted because she did not want anyone to know she had run away. She thought that if she told someone about the assault, she would have to go back home, which she did not want to do.

Around 9 p.m. on April 7, 2013, approximately 19 to 20 hours after being dropped off at the bus station, F.G. was approached by a security guard. After initially lying to the security guard, F.G. told him her name and he contacted the Omaha Police Department.

Shortly thereafter, Omaha Police Officer Sean Quinlan and his partner arrived at the bus terminal. Quinlan spoke with F.G. for about an hour, initially asking general questions about her running away from home. Quinlan noted that F.G. was really quiet and timid and was not making much eye contact. As Quinlan continued talking with F.G., she became more emotional and appeared visibly shaken. F.G. eventually disclosed the assault to Quinlan. F.G. advised Quinlan that her attacker was clean-shaven, wore glasses, had short hair, a stocky build, and drove a gray-colored car. Based on the information F.G. provided to Quinlan, F.G. was transported to a hospital for a sexual assault exam.

Once F.G. arrived at the hospital, she and her parents met with Jennifer Tran, a sexual assault nurse examiner. Tran explained her role in providing medical care and conducting a forensic examination. After obtaining F.G.'s medical history from F.G. and her parents, Tran asked F.G. to describe the assault. Tran testified that it is important to receive an accurate account of the assault for purposes of diagnosis and

6

treatment. Tran also advised that it is important to know who assaulted the victim because there is a need to ensure the perpetrator is not a family member and it also guides the care plan in terms of treatment for sexually transmitted diseases. F.G. gave Tran a history of the assault, and Tran testified that she relied on its accuracy for treatment and diagnosis.

Over Summage's hearsay objection, Tran testified that F.G. told Tran she had run away from home and had been picked up by an African-American male, who said his name was "Leo." F.G. said as they drove, Summage first tried to force her onto his lap, and then pushed her into the backseat. F.G. said she remembered being somewhere near 78th Street and the interstate in a parking lot, where Summage got into the backseat with her and pulled off one of her pant legs and one side of her underwear. F.G. told Tran that Summage said he would hurt her or beat her if she tried to fight him. Tran testified that F.G. told her that Summage then pulled down his pants, put on a condom, and tried to penetrate her vaginally with his penis. F.G. told Tran that Summage was unsuccessful at first and that it hurt, but that he continued to try and was eventually successful. F.G. said Summage stopped on his own and put on his clothes. He then told her that he would buy her a bus ticket to Chicago and he took her to the bus station and dropped her off. F.G. told Tran that she was at the bus station the entire day, until a police officer approached her and asked if she was a runaway.

After F.G. described the assault to Tran, Tran did a physical examination of F.G. During the exam, Tran went over F.G.'s body with a Wood's lamp, a luminescent blue-light source that identifies bodily fluids typically invisible to the naked eye. Tran identified a glowing area on F.G.'s right buttock, which she swabbed and placed in the sexual assault kit. Tran then combed F.G.'s pubic hair, collected vaginal and anal swabs, and conducted a pelvic exam. During the pelvic exam, Tran noticed a tear near the opening of F.G.'s vagina, which appeared to be fresh. Tran testified that the type and location of vaginal tear suffered by F.G. is a common injury found in sexual assault victims. Tran stated that based on her training and experience, the results and findings of her examination were consistent with F.G.'s history of the assault.

After Tran completed the exam, she collaborated with a physician to discuss a treatment plan for F.G. F.G. was then provided treatment for potential sexually transmitted diseases. Tran also testified that she was concerned about F.G.'s mental health because she had fresh cut marks from a razor, so a behavioral health consult was ordered. F.G. was subsequently admitted to inpatient psychiatric care.

The sexual assault kit collected from F.G. was sent to a laboratory for testing done by Joseph Choquette. Three samples were tested: vaginal swabs, a swab from the glowing area on F.G.'s buttocks, and F.G.'s underwear. Choquette determined the vaginal swabs contained a full DNA profile from a single female source. Choquette noted that the use of a condom during intercourse greatly reduces the likelihood of locating a second source in a vaginal swab. He further testified that when no semen is present, the overwhelming number of female cells in a vaginal swab make it difficult to generate a male profile off of skin cells or saliva alone.

Testing done on the swab from the glowing area on F.G.'s buttocks yielded a partial DNA profile, but the profile was inconclusive and a contributor could not be determined. Testing done on the waistband of F.G.'s underwear identified the presence of two DNA profiles and F.G. was the major contributor. The minor contributor's DNA profile did not contain enough information to make a conclusive finding.

Omaha Police Officer Sarah Spizzirri was assigned to the investigation and interviewed F.G. on April 17, 2013. F.G. provided Spizzirri with a description of the man who had sexually assaulted her. F.G. said her attacker wore glasses, was bald or balding, and drove a dark-colored two-door car. F.G. told Spizzirri she did not see any tattoos on her attacker because it was too dark.

During her investigation, Spizzirri obtained video surveillance footage from inside and outside the Kwik Shop on April 6, 2013. The DVD containing the surveillance was entered into evidence. Spizzirri also spoke with Jimerson, who provided information regarding the car and identified the person from the surveillance footage as "Leo." Using the name "Leo" and a picture taken from the surveillance footage, Spizzirri was able to identify Summage as the suspect. Spizzirri showed

F.G. a photo lineup with six pictures, which included a photo of Summage that was 8 years old. F.G. was unable to identify her attacker from the photo lineup. F.G. did identify Summage as her attacker at trial.

(Filing 10-3 at CM/ECF pp. 2–5.)

## B. Direct Appeal

Summage appealed his conviction to the Nebraska Court of Appeals on January 2, 2015. (Filing 10-1 at CM/ECF p. 2; Filing 10-11 at CM/ECF p. 12.) Summage was represented on appeal by the same attorneys from the public defender's office that represented him at trial. In his brief on direct appeal, Summage assigned that the state district court erred in (1) failing to grant his motion to dismiss at the close of the State's case because the State presented insufficient evidence to support a conviction, (2) admitting hearsay evidence regarding the assault, and (3) imposing an excessive sentence. (Filing 10-5 at CM/ECF p. 4; *see also* Filing 10-3 at CM/ECF p. 6.) The Nebraska Court of Appeals rejected each of Summage's claims on the merits and affirmed his conviction and sentence in a Memorandum Web Opinion entered November 17, 2015. (Filing 10-3.)

Summage petitioned the Nebraska Supreme Court for further review and contended that the Nebraska Court of Appeals erred in denying each of his three claims. (Filing 10-7.) The Nebraska Supreme Court denied Summage's petition for further review on January 13, 2016. (Filing 10-1 at CM/ECF p. 4.)

## C. Postconviction Proceedings

Summage filed a pro se motion for postconviction relief in the state district court on January 30, 2017 and requested the appointment of counsel. (Filing 10-14 at CM/ECF pp. 2–13.) Counsel was appointed and an amended motion for postconviction relief was filed on May 1, 2017. (Filing 10-12 at CM/ECF pp. 2–13.) In his amended motion, Summage alleged that he was denied the effective assistance

9

of counsel because trial counsel (1) failed to pursue a statutory speedy trial violation; (2) failed to move to suppress or object to the victim's in-court identification testimony; (3) failed to investigate or present alibi evidence; (4) failed to investigate the existence of a car seat in the back of Summage's car on the night of the assault; and (5) failed to object to prosecutorial misconduct during closing arguments. (*Id*.) Summage also alleged he received ineffective assistance of appellate counsel because counsel failed to raise the foregoing claims on appeal. (Filing 10-12 at CM/ECF p. 13.)

The state district court held an evidentiary hearing on Summage's amended postconviction motion at which the court received the deposition testimony of Summage and the public defender who represented him at trial and on appeal. (Filing 10-20.) In a written order entered on November 1, 2019, the state district court denied Summage's amended motion for postconviction relief and generally concluded that Summage failed to establish that his trial counsel was ineffective. (Filing 10-12 at CM/ECF pp. 15–21.) Summage appealed, arguing that the state district court erred in denying his claims of ineffective assistance of trial counsel. (Filing 10-4.) On appeal, Summage raised the same ineffective assistance of counsel claims that he raised in his amended postconviction motion with the exception of trial counsel's failure to investigate the existence of a car seat in Summage's car and his ineffective assistance of appellate counsel claim. (Filing 10-8; *see also* Filing 10-4 at CM/ECF p. 2.) The Nebraska Court of Appeals affirmed the state district court's judgment in a Memorandum Opinion entered November 5, 2020. (Filing 10-4.)

Summage filed a petition for further review in the Nebraska Supreme Court, assigning that the Court of Appeals erred in denying his claims that counsel was ineffective in failing to (1) pursue a statutory speedy trial violation and (2) object to certain statements made by the prosecutor during closing arguments. (Filing 10-10 at CM/ECF p. 1.) The Nebraska Supreme Court denied Summage's petition for further review, and the mandate issued on January 20, 2021. (Filing 10-2 at CM/ECF p. 4.) Summage filed his habeas petition in this court on February 24, 2021. (Filing 1.)

10

## III. OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. I elaborate upon those concepts next so that I may apply them later in a summary fashion as I review Summage's claims.

### A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional

11

> issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the

petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

## C. The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for petitioners to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance

of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

## IV.  DISCUSSION

### A. Claim One

In Claim One, Summage argues that he was denied due process of law because the evidence was insufficient to prove that he was guilty of first degree sexual assault. (Filing 1 at CM/ECF p. 5; Filing 6 at CM/ECF p. 1.) The Nebraska Court of Appeals addressed Summage's sufficiency claim on the merits in his direct appeal and found as follows:

> Summage first argues that the evidence was insufficient to support a conviction for first degree sexual assault. The evidence upon which a jury may rely in making its findings may be direct, circumstantial, or a combination thereof. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). Circumstantial evidence is to be treated the same as direct evidence, and the State, upon review, is entitled to have all conflicting evidence, direct and circumstantial, and the reasonable inferences which can be drawn from the evidence viewed in its favor. *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992).
>
> Pursuant to Neb. Rev. Stat. § 28–319 (Reissue 2008), "[a]ny person who subjects another person to sexual penetration without the

15

consent of the victim . . . is guilty of sexual assault in the first degree."
Summage does not dispute that F.G. was sexually assaulted. Rather, he
claims the evidence was insufficient to show that he was her assailant
because (1) neither he nor his vehicle matched the description provided
by F.G., and (2) his DNA was not found on F.G.'s person or on her
clothing.

Summage first contends that F.G.'s description of her assailant
did not match his physical characteristics. The video surveillance from
the Kwik Shop on April 6, 2013, shows that Summage was a stocky,
African-American male with a thin or partial goatee and clean-shaven
cheeks. He was wearing glasses, a long-sleeved shirt, and a baseball
cap. Jimerson also testified that on the day in question, Summage was
wearing glasses and a "Jordan" hat. She also testified that she knew he
had tattoos "all up his arm" and possibly a couple on his neck.

F.G. told Quinlan that her attacker was clean-shaven, rather than
describing him as having some facial hair. She also did not mention the
man having a hat. However, a hat is easily removable. F.G.'s
description of her attacker matches Summage in other regards. F.G.
testified that her attacker was an African-American male who was
wearing glasses. She also testified that he was wearing a long-sleeved
shirt, which he took off before assaulting her. F.G. also told Quinlan
that her attacker had a stocky build. Although F.G. told Spizzirri that
she did not see any tattoos on her attacker, she also said that it was dark
in the parking lot where the assault occurred.

Summage also points out that F.G. was unable to pick him out of
a photo lineup. While this is true, Spizzirri testified that the photo of
Summage used in the lineup was 8 years old. Further, F.G. identified
Summage as her assailant after personally observing him in the
courtroom at trial. She explained that she was able to identify him at
trial but not in the photo line-up because the lighting in the pictures was
different.

In regard to his vehicle, Summage argues that the surveillance
video from the Kwik Shop shows that he was driving a metallic, gold
colored car with no front license plate. Further, Jimerson testified that
Summage was driving a gold, two-door car with in-transit signs in the
front and back windows. F.G., on the other hand, testified that the car

was a two-door, dark colored vehicle, and that she did not notice any in-transit signs on the vehicle. She also acknowledged that she told police officers that the car was gray, and testified at her deposition that it was not a metallic car.

However, the only time F.G. saw the outside of Summage's vehicle was before she got in. She testified that the lighting was not very good at the location where Summage picked her up. She also testified that when the car pulled up next to her, she was not paying attention to the exterior color of the car. Once F.G. got into the vehicle, she remained inside the vehicle until Summage dropped her off at the bus station. Further, Officer Quinlan testified that F.G. told him the car was gray and that based on a photo of Summage's car from the surveillance video, Quinlan testified he would describe the car as "possibly a gold or a gray, silver."

Any discrepancies in F.G.'s description of Summage's physical characteristics or his vehicle were for the jury, as the trier of fact to resolve. See *State v. McIntyre*, 290 Neb. 1021, 863 N.W.2d 471 (2015) (an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact).

Summage also argues that the evidence is insufficient because his DNA was not found on F.G.'s body or her clothing despite F.G.'s assertion of vaginal penetration with his penis and lubrication of her vagina with his saliva. However, the fact that his DNA was not found, does not equate to a finding that he was not F.G.'s attacker. No complete DNA profile was found on the items tested other than F.G.'s own DNA. There were partial DNA profiles found on F.G.'s buttocks and underwear but a contributor could not be identified. Choquette testified that the use of a condom would greatly reduce the likelihood of locating a second DNA source in a vaginal swab. He further testified that when no semen is present, the overwhelming number of female cells in a vaginal swab make it difficult to generate a male profile off of skin cells or saliva alone. The failure to find Summage's DNA on F.G.'s person or clothing does not mean the evidence was insufficient. There was other competent evidence to support a finding that Summage committed the crime.

Summage was standing outside the Kwik Shop talking to Jimerson when F.G. exited the store. Jimerson testified that she knows Summage as "Leo." Summage asked F.G. how she was doing and suggested to Jimerson that he should give F.G. a ride because he did not think she should be walking by herself. A few minutes later, Summage got into his vehicle, left the Kwik Shop parking lot, and headed south on 72nd Street—the same street and direction F.G. was walking. Shortly thereafter, a man matching Summage's general physical description pulled up next to F.G. in a two-door vehicle and offered to give her a ride. Once F.G. was inside the vehicle, the man said his name was "Leo" and explained that Leo was short for another name. F.G. could not remember the actual name, but knew it was something unusual. Summage's first name is "Lenado." The man subsequently sexually assaulted F.G. and then took her to the bus station. F.G. identified Summage at trial as the man who picked her up and assaulted her. Viewed in the light most favorable to the prosecution, the evidence was sufficient to support Summage's conviction.

(Filing 10-3 at CM/ECF pp. 6–8.)

The court's review of a habeas petition that alleges insufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979):

In *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court articulated a narrow standard of review for questions of sufficiency of the evidence. Under *Jackson*, a habeas petitioner is entitled to relief if [the court] conclude[s] that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt. In applying this standard, [the court] do[es] not re-weigh the evidence, and [the court] must resolve inconsistencies in favor of the prosecution. Under AEDPA, [the court] may grant relief only if [it] find[s] the [Nebraska Court of Appeals'] conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard both incorrect and unreasonable.

*Brende v. Young*, 907 F.3d 1080, 1085 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 74 (2019), *reh'g denied*, 140 S. Ct. 634 (2019) (quoting *Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015)).

18

Having reviewed the trial transcripts in Summage's criminal trial, the court finds that the Nebraska Court of Appeals' adjudication of Claim One did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. The Nebraska Court of Appeals correctly applied the *Jackson v. Virginia* standard to the question of whether the evidence was sufficient to support Summage's conviction for first degree sexual assault, and the Nebraska Court of Appeals did so in an objectively reasonable manner; neither the reasoning nor the result contradicts *Jackson v. Virginia*.

Summage primarily argues that the Nebraska Court of Appeals' decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. (Filing 16 at CM/ECF pp. 3–6.) However, Summage does not take issue with any of the Nebraska Court of Appeals' factual findings; rather, Summage essentially asks this court to reweigh the evidence and reassess the credibility of the witnesses at trial to reach the conclusion that the evidence was insufficient to support his conviction. This I cannot do. *See Thiel v. Schuetzle*, 200 F.3d 1120, 1122-23 (8th Cir. 1999) (finding federal district court erred in reassessing credibility of witness' testimony) (citing *Haymon v. Higgins*, 846 F.2d 1145, 1147 n.4 (8th Cir.1988) (rejecting insufficiency of the evidence claim based on inconsistencies in testimony offered to jury and stating that "[i]t is not the function of the reviewing federal court to reweigh the evidence or determine questions of credibility")).

Again, I have thoroughly considered the trial transcripts as well as Summage's written and oral arguments and find that Summage cannot overcome the barrier posed by 28 U.S.C. 2254(d). There is no merit to his claim that the evidence was insufficient to support his conviction for first degree sexual assault.

**B. Claim Two**

Summage asserts in Claim Two that the state district court denied him his right of confrontation when it allowed the sexual assault nurse, Jennifer Tran, to testify as to out-of-court statements made by the alleged victim. (Filing 1 at CM/ECF p. 7; Filing 6 at CM/ECF p. 1.) Respondent submits that this claim is procedurally defaulted or, alternatively, it is plainly without merit. I agree.

Summage objected to Tran's testimony at trial on hearsay grounds. (Filing 10-18 at CM/ECF pp. 13, 16–17.) In both his direct appeal brief and petition for further review, Summage alleged both hearsay and confrontation grounds. (Filing 10-5 at CM/ECF pp. 16–19; Filing 10-7 at CM/ECF pp. 5–8.) However, the Nebraska Court of Appeals only addressed Summage's claim on the basis of hearsay because Summage failed to object to Tran's testimony on confrontation grounds at trial. *See, e.g.*, *State v. Martinez*, 306 Neb. 516, 531, 946 N.W.2d 445, 459 (2020) ("An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground.") Summage cannot raise this claim in a successive postconviction motion, and it is, therefore, procedurally defaulted. *See State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003) ("An appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion."); *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal.").

Even if Claim Two had not been procedurally defaulted, Respondent is correct that the claim is clearly without merit because F.G. (i.e., the declarant) testified at trial and was subject to cross-examination regarding the statements at issue. There is no confrontation violation under *Crawford v. Washington*, 541 U.S. 36 (2004), if the declarant testifies at trial. *See, e.g.*, *United States v. Charboneau*, 613 F.3d 860, 861 (8th Cir. 2010) (quoting *United States v. Wipf*, 397 F.3d 677, 682 n. 2 (8th Cir.

2005)) ("When a child victim testifies at trial, '*Crawford* is inapplicable.'"). Accordingly, Summage is not entitled to any relief on Claim Two.

## C. Claims Three and Four

In Claims Three and Four, Summage alleges he received ineffective assistance of trial and appellate counsel. (Filing 1 at CM/ECF pp. 8–10, 12; Filing 6 at CM/ECF p. 1.) Specifically, Summage alleged he received ineffective assistance of counsel when his trial counsel (1) failed to pursue a statutory speedy trial violation; (2) failed to file a motion to suppress the victim's in-court identification testimony; (3) failed to investigate or present alibi evidence; (4) failed to investigate, depose, and question Amanda Jimerson about the presence of a child's car safety seat in the back seat of Summage's vehicle; and (5) failed to object to certain remarks made by the prosecutor during closing arguments. (Filing 1 at CM/ECF pp. 8–10.)

Summage raised all grounds of Claims Three and Four in his amended motion for postconviction relief. (Filing 10-12 at CM/ECF pp. 2–13.) In his postconviction appeal, however, he only raised Grounds 1, 2, 3, and 5, above, and abandoned Ground 4, the child car seat claim, as well as the ineffective assistance of appellate counsel claim. (Filing 10-8 at CM/ECF pp. 5–7.) Furthermore, in his petition for further review, Summage only raised two claims of ineffective assistance of counsel based on trial counsel's failure to pursue a statutory speedy trial violation (Ground 1) and object to the prosecutor's remarks during closing arguments (Ground 5). (Filing 10-10 at CM/ECF p. 1.) Thus, all grounds alleged by Summage in Claims Three and Four, with the exception of Grounds 1 and 5, are procedurally defaulted because Summage failed to include those grounds in his petition for further review in his postconviction appeal and he cannot present those grounds in a successive postconviction motion. Summage has not argued, let alone demonstrated, cause and prejudice for the default, and, upon careful review, I find none.

Grounds 1 and 5 received one complete round of Nebraska's established appellate review process so I address each ground below.

### *1. Failure to Pursue Statutory Speedy Trial Violation*

The Nebraska Court of Appeals rejected Summage's claim that counsel was ineffective for failing to pursue a statutory speedy trial violation as follows:

> Summage argues that his trial counsel was ineffective for failing to pursue a statutory speedy trial violation. In its order denying Summage's motion for postconviction relief, the district court found that defense counsel had not been ineffective because "sufficient tolling of the speedy trial clock was evidence to bring the defendant to trial within six months of the Information being filed."

> When a defendant alleges he or she was prejudiced by trial counsel's failure to properly assert the defendant's speedy trial rights, the court must consider the merits of the defendant's speedy trial rights under *Strickland*. *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018). Only if a motion would have resulted in the defendant's absolute discharge, thus barring a later trial and conviction, could the failure to move for discharge be deemed ineffective assistance. *Id.*

> To calculate the deadline for trial for speedy trial purposes, a court must exclude the day the State filed the information, count forward 6 months, back up 1 day, and then add any time excluded under Neb. Rev. Stat. § 29-1207(4) (Reissue 2016). See *State v. Collins*, *supra*. In this case, the original information was filed on July 3, 2013. Therefore, the speedy trial deadline before adding any excluded time was January 2, 2014. Summage's trial began on September 22, 2014, 262 days beyond the 6-month statutory period. We thus consider whether at least 262 days are properly excluded under § 29-1207(4) from the speedy trial calculation.

> The State argues that there were three periods of excludable time pursuant to § 29-1207(4). First, on August 8, 2013, Summage requested a continuance until September 11, 2013, which extended the trial deadline by 34 days. Summage acknowledges that this period should be excluded.

The record further shows that on September 16, 2013, Summage filed a motion seeking production of the victim's mental health records pursuant to *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989). On April 9, 2014, the district court disposed of the *Trammell* motion by ordering the State to provide the victim's mental health records to Summage. Summage argues that only part of this time period is excludable for speedy trial purposes, because he claims that at least some of the waiting period was caused by the State's negligent failure to produce the records for in camera review by the district court. However, there was no evidence presented at the evidentiary hearing that showed negligence by the State. Moreover, the plain terms of § 29-1207(4)(a) exclude all time between the time of the filing of the defendant's pretrial motions and their final disposition, regardless of the promptness or reasonableness of the delay. *State v. Turner*, 252 Neb. 620, 564 N.W.2d 231 (1997). We therefore agree with the State and conclude that the 205 days between the filing of Summage's *Trammell* motion and the court's order disposing of that motion should be excluded from the speedy trial calculation.

Finally, on May 15, 2014, Summage filed a motion in limine seeking to prevent the victim from testifying at trial. The district court ruled on the motion in limine on June 16, 2014. However, while the motion in limine was still pending, on May 27, 2014, Summage filed a pro se motion to dismiss, alleging that his right to a speedy trial had been violated. That motion was still pending on September 22, 2014, the date Summage went to trial. The State therefore argues that the entire period between May 15 and September 22 (103 days) should be excluded. We agree.

The record shows a total of 342 excludable days from the speedy trial calculation in this case. After adding the excluded time, the deadline for trial was December 11, 2014. Because the deadline for speedy trial purposes had not run, defense counsel could not have been ineffective for failing to file a motion for discharge on speedy trial grounds or otherwise failing to pursue Summage's speedy trial rights. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018). This argument fails.

(Filing 10-4 at CM/ECF pp. 5–8.)

The record before me includes the motions and orders relied upon by the Nebraska Court of Appeals in finding Summage's ineffective of assistance of counsel claim to be without merit. (Filing 10-13 at CM/ECF pp. 4, 5 , 8, 15, 17–22.) Summage does not dispute the Nebraska Court of Appeals' speedy trial calculations but rather argues that his counsel was ineffective in failing to follow up on Summage's pro se motion for discharge filed on May 27, 2014, which the state district court never ruled on prior to trial. (Filing 16 at CM/ECF pp. 8–9.) However, at the time Summage filed his motion for discharge, the speedy trial clock had not expired, and, therefore, Summage's counsel was not ineffective for failing to pursue Summage's statutory right to a speedy trial. Moreover, there is evidence in the record that trial counsel discussed with Summage that pursuing the pro se motion to discharge would further delay his trial and Summage, ultimately, decided to go to trial. (Filing 10-20 at CM/ECF pp. 56–57, 112–115, 144–147.)

Thus, upon careful review of the record, I find there is no basis for concluding that Nebraska's speedy trial requirements were violated and thus no basis for concluding that Summage was denied effective assistance of counsel. In short, there is no basis for concluding that the Nebraska Court of Appeals' decision was contrary to, or involved an unreasonable application of, *Strickland*.

### 2. Failure to Object to Closing Arguments

Summage claims his trial counsel was ineffective for failing to object to certain remarks made by the prosecutor in closing arguments. Specifically,

during closing arguments the prosecutor referenced the length of the sexual assault examination the victim underwent at the hospital and stated: "Someone making that up does not do that." The prosecutor then went on to say: "Everything [the victim] had to go through is bad. Nothing good. But she did it. Why? Because it happened. For all of those reasons, and more, [the victim] is believable. [The victim] is credible as to what happened that night."

24

(Filing 10-4 at CM/ECF pp. 12–13; *see also* Filing 10-18 at CM/ECF p. 57–58.)

"A prosecutor must limit the closing argument to the evidence and the reasonable inferences that may be drawn from it." *United States v. Eagle*, 515 F.3d 794, 805 (8th Cir. 2008). "The prosecutor is entitled to rebut defense attacks on witness credibility." *United States v. Collins*, 642 F.3d 654, 657 (8th Cir. 2011). However, "[i]mproper vouching occurs when a prosecutor refers to facts outside the record, implies that the witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility." *United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004).

Importantly, when comments made during a prosecutor's closing argument are not objectionable, they are not a basis for an ineffective assistance of counsel claim. *Epps v. State*, 901 F.2d 1481, 1483 (8th Cir. 1990); *see also Williams v. Lockhart*, 797 F.2d 344, 347 (8th Cir. 1986) (rejecting an ineffective assistance of trial counsel claim in relevant part because the prosecutor's closing argument was not improper).

Here, the Nebraska Court of Appeals carefully examined the prosecutor's statements, determined that the prosecutor's comments did not amount to prosecutorial misconduct, and, therefore, rejected Summage's claim that trial counsel was ineffective for failing to object to them. (Filing 10-4 at CM/ECF pp. 11–13.) Upon review of the record, the court concludes that this ruling by the Nebraska Court of Appeals was not factually unreasonable, nor did it involve a misapplication of *Strickland* or any other federal law. A review of the prosecutor's closing argument establishes that the prosecutor was simply arguing the victim's credibility based on reasonably drawn inferences from the evidence presented at trial. (Filing 10-18 at CM/ECF pp. 49–58.) Because the portions of the prosecutor's closing argument challenged by Summage were not objectionable, the failure of trial counsel to object to those statements does not constitute the ineffective assistance of

counsel. The decision of the Nebraska Court of Appeals rejecting this ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. *See Kinder v. Bowersox*, 272 F.3d 532, 554 (8th Cir. 2001) (noting the state court reasonably applied *Strickland* in deciding that it was not "objectively unreasonable for counsel to fail to object to" a prosecutor's closing argument that had not been found improper).

Based on the foregoing, Summage is not entitled to habeas relief on Claims Three and Four of the petition.

## V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Summage is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that:

1.      The Petition for Writ of Habeas Corpus (filing 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued.

2.      Judgment will be issued by separate document.

3.      Given my impending transition to inactive senior status, this case shall be transferred in accordance with paragraph 19(b) of General Order No. 2022-04 for the purposes of any appeal that may be filed.

Dated this 14th day of December, 2022.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge